HAUSMEISTER, INC., Plaintiff and Counterdefendant-Appellee, *v.* WILLIAM S. WAIBEL, Defendant.—(BILL WAIBEL, INC., Counterplaintiff-Appellant.)

(No. 74-140;

Third District—June 12, 1975.

Swain, Johnson & Gard, of Peoria (Mishael O. Gard, of counsel), for appellant.

McConnell, Kennedy, McConnell & Morris and Goldsworthy & Fifield, both of Peoria (W. Thomas Johnston, of counsel), for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Counterdefendant Hausmeister, Inc. (hereafter called "Hausmeister"), contracted to install a lawn sprinkler system at counterplaintiff Waibel's

apartment complex. Hausmeister filed suit to collect $595 allegedly owed by Waibel for part of the installation and for subsequent repairs to the system. Waibel counterclaimed for $27,268 in damages resulting from three instances of flooding in basement apartments which were asserted to have been caused by Hausmeister's defective installation and repair work. After a bench trial, the court entered judgment for Waibel on the complaint, and for Hausmeister on the countercomplaint, thus denying recovery to both parties. Appeal is taken only from the judgment on the countercomplaint.

The record shows that the lawn sprinkler system was installed at each of five apartment buildings at about the time construction of each was completed and that the sprinklers were used almost daily to keep newly laid sod saturated. Each building had a separate system composed of three metal sprinkler heads in front and three in back, which were screwed onto 8-inch plastic riser pipes. The risers extended below ground and connected to underground plastic supply pipes by "T" couplings. When the water was turned on, water pressure caused the sprinkler heads to oscillate. Each system was controlled by a shut-off valve in a basement utility room.

Three instances of flooding occurred. At Building No. 3 a riser was broken when it was bumped by a lawn mower in mid-April, 1970, and, after Hausmeister repaired the broken unit, flooding occurred in two basement apartments. A second break was then discovered in the underground pipe leading to the repaired riser, and after it was repaired by Hausmeister, no further flooding occurred. During cross-examination, Hausmeister's manager, Mr. Bell, testified that at least part of the water in the apartments came from the break in the pipe, but that other water would have been "available" in the area because of Waibel's practice of overnight watering.

At Building No. 5 water was discovered in the basement in June, and investigation revealed a leak in the main sprinkler pipe at a connection located underground 6 to 12 inches out from the front wall of the building. There was contradictory testimony concerning the size of the leak, the amount of water discharged, and whether the leak was the cause of water in the apartments. Mr. Bell testified for Hausmeister that the leak was just a drip which discharged less than 1 gallon of water per hour and that, in his opinion, the flooding was caused by running the system 8 to 10 hours the previous night. Waibel, on the other hand, testified that a large quantity of water was spraying from the pipe connection and that he believed all of the water in the basement came from the leak.

At Building No. 1 water entered the basement in July, and Waibel found one sprinkler head broken off at the ground with water ejecting

vertically from the riser. Waibel testified that, having seen a sprinkler head vibrate off the riser at Building No. 2 a week later, and having seen other sprinkler heads broken off at other times, in his opinion the sprinkler heads were set too high above ground and that oscillation of the heads jarred the plastic risers until they broke, and that the broken sprinkler head had caused the flooding at Building No. 1. Waibel also testified that as a result he instructed Hausmeister to install metal risers and to lower the risers and set them in concrete to prevent such breakage in the future. Bell testified that vibration was normal, that the sprinklers were the correct height above ground, that in his opinion the broken sprinklers were damaged as a result of vandalism or accidents, and that he had voluntarily without charge replaced all plastic risers with shorter metal risers set in concrete to prevent vandalism. A witness for Waibel testified that some sprinkler units still have plastic risers.

Waibel also testified that the sprinkler system has worked perfectly at all times except the three instances of flooding, and that no other flooding has occurred from any other cause. The latter testimony was contradicted by evidence that water damage had occurred at Building No. 4 during the same period of time. A landscape expert, who had charge of landscaping the apartment complex, testified on behalf of Waibel that all-night watering of the new sod was desirable and would not have caused water to enter the basement apartments. Bell testified that each sprinkler head put out 184 gallons of water per hour, which was the equivalent of 1 inch of rainfall each hour, and that he had warned Waibel against excessive use of the system.

At the close of the bench trial, the court asked the attorneys to submit briefs which they failed to do. The order finally entered by the court expressly found that the sprinkler system installation caused water to get into the buildings, that the system was unusable for the purpose for which it was sold, and that therefore Hausmeister could not recover on the complaint. On the counterclaim the court found that Waibel had control of the sprinkler system and knew its condition and still used it, that the work of Hausmeister was not the proximate or nearest cause of the injury, and therefore that Waibel could not recover. Hausmeister did not cross-appeal from the judgment for Waibel on the complaint.

■■ On appeal, Waibel argues that these findings confuse his action for breach of an implied warranty under the contract with a tort action and that the court has in effect imputed contributory negligence to Waibel. Although the term "proximate cause" is frequently used in tort cases, we believe that mere use of that phrase in a contract action is not error per se. In actions for breaches of contract and for torts alike there must be a wrongful act done and a loss resulting from that wrongful act,

and the injury suffered by the plaintiff must be the natural and not merely the remote consequence of defendant's wrongful act. (*Town of Thornton v. Winterhoff*, 406 Ill. 113, 92 N.E.2d 163 (1950); *Undergrour Construction Co. v. Sanitary District of Chicago*, 367 Ill. 360, 11 N.E.2d 361 (1937).) The primary question in this case, as the trial court noted, is whether the evidence sustained Waibel's burden of proving that the water damage was caused by Hausmeister's defective workmanship.

■■ Waibel also contends that the court's findings of fact and judgment on the countercomplaint are inconsistent with the findings and judgment on the complaint and are against the manifest weight of the evidence. Hausmeister argues that the evidence before the court supported the findings and judgment on the countercomplaint, and, even if we should decide that the findings were incorrect or inconsistent, we should nevertheless affirm the judgment. We agree that our only concern is whether the judgment was correct, regardless of the reasons given. *Keck v. Keck*, 56 Ill.2d 508, 309 N.E.2d 217 (1974); *Platz v. Walk*, 3 Ill.2d 313, 121 N.E.2d 483 (1954).

The record shows that the only testimony attributing the cause of water damage to the defective workmanship of Hausmeister consisted of statements by Waibel that in his opinion the water that entered the three buildings came from leaks in the sprinkler system. This testimony was contradicted by Bell who testified that all night operation of the system would cause excessive water to accumulate which would enter the buildings through the basements. He stated that the system was designed to deliver about 184 gallons of water per hour at each sprinkler which was equivalent to 1 inch of water per hour. At the time of installation Bell instructed Waibel that 1 inch of water per day was recommended for new sod, and warned Waibel later that overnight watering was excessive. It was conclusively established that the sprinklers at all three buildings were frequently operated 8 or 10 consecutive hours at night. The landscaping expert, who did the landscaping work at the apartment complex, testified that he recommended overnight watering of new sod, and that, considering the type of soil and slope of the ground, in his opinion excessive water would not enter the buildings but would merely run off into the street except in the area within 18 inches of the building walls where the soil had been disturbed at the time of construction.

Waibel testified that water entered buildings only on the three occasions alleged in his counterclaim and at no other times, and argues that we should infer that the leaks in the system must have caused the water damage. His testimony, however, was contradicted by his own witnesses. A former tenant in one of the damaged apartments in Build-

ing No. 5 testified that water began coming into his apartment along the wall of a closet about August 15, 1970, and that Waibel corrected the condition within 1 or 2 weeks. This was corroborated by the building manager. Waibel and Hausmeister both testified that the leak at Building No. 5 was repaired by mid-July. Thus we conclude that some water damage at Building No. 5 was caused by water from a source other than the sprinkler system leak. Although Waibel testified that the other buildings had no water problems, a contractor who prepared estimates for cost of repairs, testified that Waibel requested an estimate for repair of water damage at Building No. 4.

In an attempt to establish circumstantially that the sprinkler heads at Building No. 1 probably broke off due to vibration as a result of improper installation, Waibel testified to the discovery of broken sprinklers at Building No. 2, Hausmeister testified that he was called to Building No. 2 to repair three sprinklers where the risers were broken off at ground level and found one sprinkler head unit missing. Since no flooding resulted from these broken sprinklers, Hausmeister suggests an inference that the broken sprinklers at Building No. 1 did not cause the water damage there.

The foregoing summary of testimony is adequate to demonstrate the sufficiency of the evidence in support of the judgment on the counterclaim. After considering all of the evidence in the aspect most favorable to Hausmeister, we cannot say that a judgment for Hausmeister could never stand, and thus we are persuaded that the judgment of the circuit court was not against the manifest weight of the evidence, and that it must be affirmed. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504 (1967).

■■ Waibel contends that on review we are bound by the findings of the circuit court on the complaint, particularly that the installation of the sprinklers caused water to enter the buildings and that the system was unusable. Thus, it is argued, we are barred from concluding that the defective installation of the sprinkler system was not the cause of damage since no cross-appeal was taken from the judgment on the complaint. This argument assumes that the water from the leaks was the water which caused the damage and that the trial court's findings are therefore inconsistent. A court of review is required to follow that construction of the findings which will support the judgment of the trial court. (*Peterson v. United States Building Maintenance Co.*, 96 Ill.App. 2d 398, 239 N.E.2d 322 (2d Dist. 1968).) Where, as here, it is possible to reconcile the findings of the trial court in order to make the judgment as a whole consistent and reasonable, we must do so. See 46 Am. Jur. 2d *Judgments* § 73.

Bell's testimony that the sprinklers put out the equivalent of one inch of water per hour over the entire area was not contradicted. The finding of the trial court that Waibel knew the condition of the system and continued to use it can be construed to mean that Waibel knew the capacity of the system and had received instructions and warnings from Bell but continued the practice of overnight watering. Thus the water damage was caused, not by the leaks in the system, but by Waibel's excessive use of the sprinklers, and the water which flooded the apartments came primarily from the excessive watering. This construction of the trial court's findings on the counterclaim is consistent with the findings on the complaint, and is supported by substantial evidence.

We are of the opinion that the judgment of the circuit court is supported by the evidence, and we therefore affirm.

Affirmed.

STOUDER, P. J., and BARRY, J., concur.